USM CORPORATION *vs.* ARTHUR D. LITTLE SYSTEMS, INC.,
& another.[1]

No. 88-P-650.

Essex. October 6, 1989. - November 27, 1989.

Present: BROWN, SMITH, & FINE, JJ.

*Contract*, Construction of contract, Computer system, Warranty. *Warranty. Uniform Commercial Code*, Sale of goods, Warranty. *Consumer Protection Act*, Businessman's claim, Unfair act or practice. *Words*, "Turnkey."

At the trial of a claim alleging the defendant's breach of a contract to develop and install a "turnkey" computer system intended for use in the plaintiff's manufacturing business, the judge's conclusion that the parties, both sophisticated in business matters, had placed the risk of the system's poor performance on the buyer was inconsistent with the substance and purpose of the contract, including the parties' use of the word "turnkey," and was, therefore, unreasonable. [116-121]

In a written contract which was subject to the provisions of art. 2 of the Uniform Commercial Code, G. L. c. 106, a party's express warranties were to be given effect, even though their content overlapped the content of the implied warranties disclaimed in the same agreement. [121-122]

On a claim alleging the defendant's breach of a contract to develop and install a "turnkey" computer system intended for use in the plaintiff's manufacturing business, neither the defendant's stated obligation to use its "best efforts," nor the plaintiff's extensive involvement in the development of the system, nor the plaintiff's awareness of certain problems at the time it executed the contract was inconsistent with the warranty provisions of the contract and the defendant's obligations thereunder. [122-123]

At the trial of claims under G. L. c. 93A, the Consumer Protection Act, by the purchaser of a computer system against the corporation which had agreed to design and install the system, and its parent corporation, the judge did not err in concluding that neither defendant had acted in an unfair or deceptive manner toward the plaintiff by failing to disclose to it certain internal reports which suggested problems with the proposed system, where the judge was warranted in finding, as to one of the reports, that the plaintiff had been informed of its content and that, as to the other, the proposed system had changed significantly between

---

[1]Arthur. D. Little, Inc.

the time the report was written and when the contract with the plaintiff was signed. [123-125]

At the trial of claims under G. L. c. 93A, the Consumer Protection Act, the judge properly concluded that a corporation was not unfair or deceptive in regard to its disclosures concerning the financial condition of its subsidiary. [125-126]

CIVIL ACTIONS commenced in the Superior Court Department on November 26, 1979, and June 25, 1981, respectively.

The cases were consolidated for trial and were heard by *John T. Ronan*, J.

*Thomas J. Urbelis* for the plaintiff.

*Gene K. Landy* for Arthur D. Little Systems, Inc.

*David J. Brody* for Arthur D. Little, Inc.

FINE, J. This dispute concerns an attempt by the plaintiff, USM Corp. (USM), to acquire a computer system for use in its business of manufacturing and selling shoe-making equipment. The defendant Arthur D. Little Systems, Inc. (ADLS), was organized in 1971 as a wholly owned subsidiary of the defendant Arthur D. Little, Inc. (ADL), for the purpose of developing, marketing, and installing "turnkey" computer systems. USM and ADLS entered into a contract for such a system, but the result of considerable effort over the course of several years was a system which failed to meet the needs of USM. USM sued both ADLS and its parent, ADL. Against ADLS, USM alleged breach of contract and deceit. Against ADL, USM claimed liability vicariously for ADLS's breach of contract, tortious behavior, and violation of G. L. c. 93A, and, on the basis of ADL's own conduct, for violation of G. L. c. 93A. ADLS filed a counterclaim for payments from USM due on the contract.

Summary judgment was ordered in favor of ADL on the allegations of vicarious liability for ADLS's tortious conduct and breach of contract, and no argument has been made on appeal that that order was erroneous. After a lengthy jury-waived trial in the Superior Court, the judge ruled in favor of the defendants on all of the plaintiff's claims and on the counterclaim, and he assessed costs against USM. Of the

issues raised on appeal, we find it necessary to discuss at length only the contract and c. 93A claims.[2] We agree with the judge that ADL is not liable to USM under G. L. c. 93A. We disagree with his determination that ADLS is not liable to USM for breach of contract. We therefore reverse the decision in favor of ADLS on USM's claim and on the counterclaim, vacate the assessment of costs, and remand the case for a determination of damages.

1. *Breach of contract.* We take the facts from the judge's findings. Sometime prior to February 12, 1975, USM began to look into replacing its existing computer system with a more powerful one. The primary purpose of the new system, which USM called MATCON, would be to provide accounts receivable, billing data, inventory control, and other record-keeping functions. USM requested proposals for a "turnkey" systems development approach from a number of vendors, and ADLS, among others, submitted a proposal. ADLS described the services it would supply as follows: "Turnkey Systems Development: in which the complete responsibility for system development — from project definition to complete system delivery — rests with ADL Systems." In its definitive proposal, dated August 7, 1975, ADLS described its proposal as being "for the implementation of a 'turnkey' mini-computer based material control system at USM's Beverly plant." It went on to state that "[t]he proposed system is 'turnkey' in the sense that ADLS will develop and implement

---

[2]If we were to rule in favor of USM on its deceit claim, any damages would probably be duplicative of the damages to be awarded on the contract claim. In any event, given the trial judge's findings of fact concerning the nature of any misrepresentations about the system as promises, predictions, or expressions of belief, ADLS's lack of intent to mislead, ADLS's disclosure to USM of technical problems, and both ADLS and USM's reasonable reliance on Data General's assurances, we rule that ADLS is not liable to USM for deceit. See *Harris* v. *Delco Prod., Inc.,* 305 Mass. 362, 365 (1940). See also *Yerid* v. *Mason,* 341 Mass. 527, 530 (1960); *Iten Leasing Co.* v. *Burroughs Corp.,* 684 F.2d 573, 575 (8th Cir. 1982); *Chatlos Sys., Inc.* v. *National Cash Register Corp.,* 479 F. Supp. 738, 748-749 (1979), affd. and remanded for recomputation of damages, 635 F.2d 1081 (3d Cir. 1980). Contrast *Dunn Appraisal Co.* v. *Honeywell Information Sys.,* 687 F.2d 877, 882-883 (6th Cir. 1982).

a completely operable system, according to the specifications in our proposal, on a fixed price basis. ADLS will acquire the proposed computer hardware, develop the proposed applications software, integrate the two and demonstrate the proposed system in operation for acceptance by USM." The proposal was to use a minicomputer and software manufactured by Data General. Proposals from other prospective vendors would have utilized the products of other manufacturers. In weighing the various proposals, USM engaged in a detailed study of the alternatives, hired an outside consultant for advice, and discussed products directly with the manufacturers, including Data General. As a result of its studies, USM was aware that there were risks involved with ADLS's proposal, but USM favored that proposal over the others.

In the fall of 1976, ADLS personnel began to meet with USM personnel in order to define USM's use requirements so that ADLS could create specific application functions and design a suitable software program. By this time, changes had been made in the proposal with respect to both the hardware and the software to be used for the system.[3] In December of 1976, USM approved the MATCON project and authorized ADLS to proceed to implement the new system. On or about December 15, 1976, the first design phase of the project was completed with ADLS's delivery to USM of the two-volume Functional Design document and the Systems Architecture and Performance Analysis document.

The stated purpose of the Performance Analysis portion of the Systems Architecture and Performance Analysis document was "[t]o publish the results of an analysis of expected performance of the system." Among the results published was a calculation of the response time expected for the MATCON system.[4] That calculation yielded the following results: "92% of the time, response time will not exceed 2

---

[3]ADLS was now proposing use of a Data General Eclipse C-330 minicomputer and INFOS and IDEA software. Those were the products actually used.

[4]Response time is the amount of time between entry of a command into the system and the appearance on the screen of the requested output.

seconds/field[;] 98% of the time, response time will not exceed 3 seconds/field." The results were described as "estimates" based on "available data," and they were "to be reviewed at the completion of the detailed design phase in order to verify the results." However, the Performance Analysis also refers to its estimates as being conservative and describes a response time of eight or nine seconds as being the "worst case."

As the process moved forward, both USM and ADLS were aware that response time might be a problem.[5] A consultant, hired by ADLS to review the Performance Analysis, prepared a detailed report on the problem,[6] but he, along with others at ADLS, believed it could be solved by adding a second disk controller to the system. Some computer systems will support access to two disk controllers simultaneously through a process known as "overlapping" or "multiple seeks." As a result of "multiple seeks," the number of disk accesses available to the system would be doubled, thereby cutting the disk-utilization factor in half and improving response time accordingly. Throughout the spring of 1977, Data General assured ADLS that the MATCON system, using the specified products (the C-330 minicomputer and IN-

---

[5]Response time is directly related to, and primarily determined by, the number of disk accesses that must be accomplished to satisfy the requirements of the command given by the operator (so called transactional requirements). A disk is a magnetic data storage device. It operates within a disk drive. The access time of a disk is the amount of time required to physically locate and retrieve stored data necessary for a program instruction (known as a "disk read"), or to physically locate available, unoccupied space on the disk and write data in that area (known as a "disk write"). Such a read or write is known as a disk access. Disk accessing is traditionally the most time consuming action performed by the computer. A calculation which is used to help predict response time is known as the disk-utilization factor. The calculation expresses the number of disk accesses required in a particular time period as a percentage of the total number of disk accesses available during that time period. The Performance Analysis had calculated a disk-utilization factor of 60%.

[6]The consultant informed ADLS of his belief that ADLS may have underestimated the number of required disk accesses by almost half, and that the actual disk-utilization factor might be as high as 78%. He stated that any system with a disk utilization factor of over 50 to 60% was going to have "built-in" problems with response time.

FOS and IDEA), would support "multiple seeks." The judge found that ADLS reasonably relied on Data General's assurances, although they would later turn out to be false. USM was never provided a copy of the ADLS consultant's detailed report on the response time problem. The judge found, however, that USM personnel were aware of the issues raised in the report as well as the proposed solution.

On March 4, 1977, USM and ADLS memorialized their agreement in a writing entitled "Turnkey Systems Agreement." The basic agreement between the parties was that:

> "ADLS shall furnish, and Customer shall accept, a computer system (the 'System'), sometimes called a 'turnkey system' in the vernacular, that comprises the Equipment and Software Programs and satisfies the Specifications, all as set forth in the following schedule, as it might be amended, on the terms and subject to the conditions set forth below and on the following pages of this Agreement[.]"

Under the heading "Specifications," the contract provided:

> "The functions to be performed by the system are defined in the functional specifications document titled 'MATCON Materials Control System Functional Design' Volumes I and II, dated December 1976 and the MATCON Systems Architecture and Performance Analysis dated December 1976. The detail program specifications will be defined by a document developed in tasks 4 and 5 of the task breakdown structure (Table 1, Attachment B); Acceptance Test Specifications will be developed in Task 6 of the work breakdown structure."

Performance under the contract was divided into seventeen tasks to be accomplished in four phases, with defined responsibilities for both ADLS and USM. As mentioned earlier, phase one, the functional design, which included tasks one through three (Functional Design, Systems Architecture, and

Performance Analysis) was completed prior to signing the contract. Phase two was the preparation of the detail design. Phase three was to create a working system and demonstrate it for acceptability. Phase four was to bring MATCON into daily productive use.

The contract also contained a warranty clause, which provided:

> "ADLS warrants that at the time of delivery the system will be free of defects in design and will be in substantial accordance with the functional specifications produced in Tasks 1-3, Attachment B. During the first 180 days after delivery of the system, ADLS will correct any defects or deficiencies in the system without additional charge to Customer. Provided, however, that if investigation of alleged defects or deficiencies discloses that they are not in fact within the requirements set forth in the detail design (Task 4, Attachment B), such investigative effort and any programming changes performed by ADLS to correct such alleged deficiencies or defects will be charged to Customer at ADLS' regular rates. Any additional work done by ADLS after the warranty period and/or on matters other than correction of deficiencies or defects in the system will be charged for at ADLS' regular rates. THIS WARRANTY SUPERSEDES ALL OTHER WARRANTIES EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE . . . ."

A "Liability" clause required ADLS to use its "best efforts" to satisfy USM and limited ADLS's liability for damages to USM arising out of the operation and use of the system after delivery. Finally, an integration clause stated that

the writing was the exclusive and complete understanding of the parties.[7]

The detail design document was completed in mid-1977 and was periodically revised and amended throughout the life of the project.[8] By June of 1977, it had become clear to both USM and ADLS that there were major problems with the system. Over the next two years, both USM and ADLS engaged in a series of failed attempts to make the system work. For example, a second disk controller was added, but it was removed when it became apparent that the selected equipment would not support "multiple seeks." Towards the end of the project, USM rejected a number of suggestions made by ADLS to improve performance of the system. ADLS stopped all work on MATCON in September of 1979.

According to the trial judge, although ADLS had used its best efforts in trying to make the system work, the system USM was left with was "barely usable, and then only in a partial manner." For example, a September, 1978, performance test with a single active terminal yielded a response time of ten seconds. With four active terminals, the response time was thirty seconds. The system originally contemplated fourteen active terminals. By June of 1982, USM, at its own expense, had replaced the C-330 minicomputer with a Data General MV-8000 minicomputer. Following this change, the system was able to run substantially all of the programs designed for the MATCON system in a satisfactory manner.

The judge concluded that the parties in their agreement had placed the risk of the system's poor performance on USM, USM having been made aware of that risk before the contract was signed as a result of its independent analysis of the Data General products. ADLS's obligation, the judge concluded, was only to use its "best efforts" to develop a system satisfactory to USM, and, as ADLS did use its best ef-

---

[7]The total contract price was $333,913.20, $174,667.20 for computer hardware and the remainder for professional services.

[8]By April of 1977, it was clear that MATCON would not be ready by August 2, 1977, the completion date according to the contract. There is no claim that failure to complete the work on time was a breach of the contract.

forts, there was no breach of contract by ADLS. The warranties of merchantability and fitness for a particular purpose having been expressly negated in the contract, he interpreted the warranty clause to provide for only two warranties: that the system conform to the functional specifications; and that the system be free of defects in "design." The functional specifications, he concluded, however, did not include any performance or response time requirements; and the term "design," he decided, was not used in its general sense to include the over-all design or choice of component products but was limited to the "detailed design document" developed by the parties jointly in accomplishing task four. On the basis of his narrow construction of the warranties, the judge found no breach.

The interpretation of a contract presents a question of law for the court, except to the extent disputed facts bear upon such interpretation. *Robert Indus., Inc.* v. *Spence*, 362 Mass. 751, 755 (1973); *Fred S. James & Co. of New England, Inc.* v. *Hoffmann*, 24 Mass. App. Ct. 160, 165 (1987). See also Restatement (Second) of Contracts § 212(2) & comment d (1981). The object of the court is to construe the contract as a whole, in a reasonable and practical way, consistent with its language, background, and purpose. See *McMahon* v. *Monarch Life Ins. Co.*, 345 Mass. 261, 264 (1962); *Kerrigan* v. *Boston*, 361 Mass. 24, 33 (1972); *Thomas* v. *Christensen*, 12 Mass. App. Ct. 169, 175 (1981); *Finn* v. *McNeil*, 23 Mass. App. Ct. 367, 372 (1987). Extrinsic evidence bearing upon the background and purpose of the parties, as well as their understanding of the meaning of particular language used in the contract, may be considered both in the construction of ambiguous contract language and in resolving uncertainties in applying the terms of the written contract to the subject matter. See *Robert Indus., Inc.* v. *Spence*, 362 Mass. at 753; *Fred S. James & Co. of New England, Inc.* v. *Hoffmann*, 24 Mass. App. Ct. at 163-164; *Keating* v. *Stadium Management Corp.*, 24 Mass. App. Ct. 246, 249-250 (1987). See also Restatement (Second) of Contracts § 214. The trial judge's findings with respect to such evidence are binding un-

less clearly erroneous. Mass.R.Civ.P. 52(a), 365 Mass. 816 (1974). In this case, we accept the judge's findings of fact but reach the conclusion that his narrow interpretation of ADLS's contractual obligations was inconsistent with the substance and purpose of the contract and was, therefore, unreasonable. The risk under the contract that the products ADLS was to provide would, in combination, not be able to meet USM's defined needs rested, we think, with ADLS.

The judge's findings make it clear that ADLS in the mid-seventies held itself out as capable of designing computer systems to meet the business needs of its potential clients, that it proposed generally to deliver such systems on a "turn-key basis," and that USM and ADLS entered into negotiations for a "turnkey" computer system. On several occasions in the course of the negotiations, ADLS defined the word "turnkey" in such a way as to place upon itself "complete responsibility for system development." The agreement bore the heading, "Turnkey Systems Agreement." ADLS's definition of "turnkey," placing on the vendor responsibility for providing an acceptable system, conformed to the usual meaning of the word, both in the computer field and in general.[9] Whether a computer system can do a particular job in

---

[9]Courts have begun to recognize special meaning attached to the term "turnkey" in the computer industry. "[Defendant] contracted to supply a turn-key computer system; that is, a system sold as a package which is ready to function immediately. The hardware and software elements are combined into a single unit — the computer system — prior to sale." *Neilson Business Equip. Center, Inc.* v. *Monteleone*, 524 A.2d 1172, 1174 (Del. 1987). "[Plaintiff] alleges that [defendant] warranted that the system was to be 'turn-key,' with the software pre-prepared and the system ready for immediate functioning." *Triangle Underwriters, Inc.* v. *Honeywell, Inc.*, 457 F. Supp. 765, 767 (E.D.N.Y. 1978), affd. in part, revd. in part, 604 F.2d 737 (2d Cir. 1979). "Frequently, software is sold with the hardware as part of a 'turn-key' system, able to be turned on and function immediately in place at the vendee's place of business." *Dreier Co.* v. *Unitronix Corp.*, 218 N.J. Super. 260, 267 (1986), citing Holmes, Application of Article Two of the Uniform Commercial Code to Computer Systems Acquisitions, 9 Rutgers Computer and Tech. L.J. 1, 25 (1982). Courts have also recognized the significance of the term "turnkey" in a variety of other settings. For example, in the oil and gas industry, a turnkey contract exists where "the driller undertakes to furnish everything, and to do all the work required to complete the well, place it on production, and turn it over

an acceptable manner depends both upon its capability of performing the necessary functions and its ability to perform them within a reasonable period of time. Thus, response time is a material aspect of a system's acceptability. It is not surprising, therefore, that response time was the subject of much discussion between the parties during negotiations and after the contract was signed. During those discussions, ADLS was unduly optimistic in terms of the speed with which the system was capable of performing. As the judge found, because of the software's inability to accommodate "multiple seeks," the response time was so poor that the system failed to meet USM's reasonable needs. There was no fault on the part of ADLS, however. ADLS, the judge found, reasonably relied on advice from Data General that the problem could be solved. The issue, correctly defined by the trial judge, therefore, was whether ADLS under the contract had assumed the risk that the system would perform so poorly.

The use of the word "turnkey," particularly in light of ADLS's own definition, is suggestive of ADLS's assumption of responsibility for performance of the product. It is not dispositive, however, as there is more to the written contract than the use of that word. The parties, both sophisticated in business matters, were free to bargain over the terms and warranties. They did so, and they saw fit to include an integration clause restricting their obligations to those set forth in the agreement. We proceed to examine the four corners of the written document, therefore, to see if, reasonably construed in light of its background and purpose, it places the risk of poor performance on USM.

---

ready to 'turn the key' and start the oil running into the tanks." *Continental Oil Co.* v. *Jones*, 177 F.2d 508, 510 (10th Cir. 1949) (citations omitted). In the construction industry, "a turn-key job is 'a job or contract in which the contractor agrees to complete the work of building and installation to the point of readiness for operation or occupancy.' In essence, this means a project in which all the owner need to do is 'turn the key' in the lock to open the building with nothing remaining to be done and all risks to be assumed by the contractor." *Glassman Constr. Co.* v. *Maryland City Plaza, Inc.*, 371 F. Supp. 1154, 1157-1158 (D. Md. 1974), quoting from Webster's Third Intl. Dictionary 2468 (1963 ed.).

The parties assume that the contract, providing for both the sale of goods and the delivery of services, is subject to the provisions of Article Two of the Uniform Commercial Code. As the products to be supplied were "goods" and their sale constituted a significant part of the agreement, the services being incidental, that assumption is correct. See G. L. c. 106, § 2-102; *Triangle Underwriters, Inc.* v. *Honeywell, Inc.*, 604 F.2d at 742-743; *Neilson Business Equip. Center* v. *Monteleone*, 524 A.2d 1172, 1174-1175 & n.3 (Del. 1987); Article Two Warranties in Commercial Transactions: An Update, 72 Cornell L. Rev. 1159, 1163 (1987). Compare *Zapatha* v. *Dairy Mart, Inc.*, 381 Mass. 284, 290 (1980). We first examine the warranty clause to determine the scope of any express warranties. Under the Uniform Commercial Code, "any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise." G. L. c. 106, § 2-313(1)(*a*), as inserted by St. 1957, c. 765, § 1.

ADLS warranted that "at the time of delivery the system will be free of defects in design." The "system" must refer to the computer system which is the subject of the contract. In its ordinary sense, the word "design" would include the choice of hardware and software to work in combination with each other to do a particular job, and the inability of those products, in combination, to perform the required tasks within a reasonable response time would constitute a defect. The judge ruled, and ADLS argues, however, that "design" in the warranty clause was not used in its ordinary sense but refers, instead, to the "detail design document" which was developed, with USM's participation, as task four. We do not adopt so narrow a definition of "design." Elsewhere in the agreement where the "detail design document" is referred to, the reference is in those terms and not merely to "design." Moreover, so narrow a meaning of "design" in the context would make little sense. The detail design document was an unlikely subject for a warranty as it was to be produced as a

result of the joint effort of ADLS and USM, and participation in its preparation was but one aspect of ADLS's numerous undertakings.[10]

Additionally, ADLS warranted that "at the time of delivery the system . . . will be in substantial accordance with the functional specifications produced in Tasks 1-3, Attachment B." Tasks one through three in attachment B include "Functional Design," "System Architecture," and "Performance Analysis;" all of which were completed when the contract was signed, and the contract so indicates. Moreover, there is a section of the contract, labelled "Specifications," which states that the functions to be performed are defined in various specified documents, including "the Performance Analysis." The judge ruled that the warranty related only to the functioning of the system and not to its performance.

So narrow a reading of the warranty language, we think, is unreasonable. Response time, an aspect of the system's overall performance and dealt with in the Performance Analysis, was always regarded by the parties as being of significance. From the point of view of a user, a system which could perform all the necessary functions but not at a speed which would accomplish the required work within a reasonable time would be of little value. It is true that the Performance Analysis, prepared in December of 1976, is phrased in terms of estimates and goals. By the time the contract was signed, however, USM's needs were substantially defined. In fact, Attachment B to the contract lists as a USM responsibility, to be completed before the agreement was signed, the defini-

[10]The judge relied on certain language in the warranty clause as a basis for his narrow construction of "design." That language is as follows: "if investigation of alleged defects or deficiencies discloses that they are not in fact within the requirements set forth in the detail design (Task 4, Attachment B), such investigative effort and any programming changes performed by ADLS to correct such alleged deficiencies or defects will be charged to Customer at ADLS' regular rates. Any additional work done by ADLS after the warranty period and/or on matters other than correction of deficiencies or defects in the system will be charged for at ADLS' regular rates . . . ." We do not think that this language, relating to additional work that might be required of ADLS, is pertinent to a determination of the scope of the express warranties.

tion of acceptable response times. Moreover, however tentative the prediction was of a two or three second response time, an eight or nine second response time was described as the "worst case." Phrased in those terms, the Performance Analysis reasonably imported a promise by ADLS that the response time would not be substantially in excess of eight or nine seconds. As the actual response time was substantially in excess of that amount of time, the express warranty was not complied with. See *Consolidated Data Terminals* v. *Applied Digital Data Sys.*, 708 F.2d 385, 391 (9th Cir. 1983).

It remains for us to determine what effect to give to the final sentence of the warranty clause negating any other express or implied warranties, including any warranties of merchantability or fitness for a particular purpose. The response time problem implicated at least the latter implied warranty, as it made the system unfit for the use USM intended. Given the words used in the sentence disclaiming the warranties and their conspicuous appearance, they would have been effective to negate any implied warranties otherwise applicable. G. L. c. 106, § 2-316(2). The absence of the implied warranties, however, appears to be inconsistent with the two express warranties, as reasonably interpreted. General Laws c. 106, § 2-316(1),[11] requires that, if possible, the express warranties and the disclaimer language be "construed . . . as consistent with each other." It may well be that the parties agreed to the warranty disclaimer language because the express warranties, incorporating the specifications, were so detailed and complete as to render any other warranties unnecessary. If so, the various parts of the warranty clause are capable of being reconciled. To the extent that the express warranties are inconsistent with the disclaimer, how-

---

[11]General Laws c. 106, § 2-316(1), as inserted by St. 1957, c. 765, § 1, provides:

"Words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; but subject to the provisions of this Article on parol or extrinsic evidence (section 2-202) negation or limitation is inoperative to the extent that such construction is unreasonable."

ever, G. L. c. 106, § 2-316(1), requires that the express warranties be given effect. See *Consolidated Data Terminals* v. *Applied Digital Data Sys.*, 708 F.2d at 391-392. See also *Northern States Power Co.* v. *ITT Meyer Indus.*, 777 F.2d 405, 412 (8th Cir. 1985); Note, Uniform Commercial Code: Disclaiming the Express Warranty in Computer Contracts — Taking the Byte Out of the UCC, 40 Okla. L. Rev. 471 (1987). Compare *Fargo Mach. & Tool Co.* v. *Kearney & Trecker Corp.*, 428 F. Supp. 364, 371 (E.D. Mich. 1977). This is because of the usual importance of bargained-for express warranties as incorporating the "essence of th[e] bargain." Comment 1 to § 2-313 of the Uniform Commercial Code, 1A U.L.A. (Master ed. 1989). We see no reason why an express warranty in a written agreement should not be given effect even if its content overlaps with the content of an implied warranty disclaimed in the same written agreement. Cases appearing to hold otherwise involve express warranties created by statements or advertising brochures outside the written contract. See, for example, *Jaskey Fin. & Leasing* v. *Display Data Corp.*, 564 F. Supp. 160 (E.D.Pa. 1983). Cf. *Bruffey Contracting Co.* v. *Burroughs Corp.*, 522 F. Supp. 769 (D. Md. 1981). But see *Computerized Radiological Servs.* v. *Syntex Corp.*, 595 F. Supp. 1495, 1506-1507 (E.D.N.Y. 1984).

We briefly address the remaining factors which influenced the judge's decision that there was no breach of the contract by ADLS. The obligation of ADLS to use its "best efforts," reasonably construed, was in addition to its other obligations and not inconsistent with them. There were considerable services for ADLS personnel to perform and timetables to be met. In the circumstances, it is not unnatural to find such a provision alongside warranty provisions. Nor was the extensive involvement of USM personnel in the development of the system inconsistent with ADLS's warranty obligations. Given the fact that the contract was for the development of a computer system to meet USM's business needs, such involvement was necessary to identify those needs and develop the suitable programs. Finally, USM's awareness before

signing the contract that response time might present a problem would not necessarily affect the interpretation of the warranties. USM, having been advised by ADLS that the problem could be solved, had no reason to anticipate that ADLS would be incapable of solving it.

In sum, construing the language of the written agreement as a whole in light of its background and purpose and in conformity with the Uniform Commercial Code, we conclude as matter of law that the judge's interpretation of ADLS's undertaking was too grudging. Taken together, the various provisions, we think, placed the risk of an inadequately performing system on ADLS.

2. *ADLS's alleged violation of G. L. Chapter 93A.* These additional facts pertain to the c. 93A claim. ADL is a large diversified research and management consulting firm with headquarters in Cambridge. In 1971, ADL organized ADLS as a wholly owned subsidiary to enter the field of creating customized computer systems. ADL's reputation was expected to be an advantage to ADLS in marketing its services. ADL made an initial capital investment of $50,000 in ADLS, and it continued to pour in capital and make loans to ADLS over the course of its active life, even after the dispute arose between USM and ADLS. Although ADLS turned out to be an unsuccessful business venture, around the time of the contract negotiations with USM, ADL had high hopes for ADLS's success. In 1980, ADLS's directors voted to wind it down, and it was dormant at the time of trial.

While it operated, ADLS functioned as a separate entity with its own offices, staff, directors, budget, funds, etc. Over the years, some of its directors were ADL employees, one ADLS director was an ADL director, and there was some overlapping of staff. In ADL's annual reports, its financial statements were consolidated with those of its subsidiaries, including ADLS. The judge found, however, that such a reporting practice was not improper. He also found that USM knew that ADLS was a separately organized subsidiary of ADL, and he found that USM did not rely on ADL's financial statements.

Before ADLS submitted its proposal to USM on August 7, 1975, the proposal was reviewed by Frank Allen, a vice president of ADL and the chairman of ADLS's board. Allen wrote a memorandum to an ADLS officer critical of the proposal. The content of the memorandum was not disclosed to USM before the contract was signed. The substance of the proposal was materially different, however, from the contract signed in March of 1977.

In late 1976, ADLS engaged the services of Gerald Paul, a staff member of ADL. On February 11, 1977, Paul reported orally to the ADLS project manager that, in his opinion, ADLS had underestimated the disk utilization factor and that there were likely to be response time problems. A short time later, Paul communicated the same opinion in writing to ADLS and ADL personnel. A copy of the Paul report was not provided to USM. The judge found, however, that USM was informed of the content of the report and was kept abreast of the response time problem as the work proceeded.

USM contends: (1) that ADL's own nondisclosures constituted "unfair or deceptive acts" as defined by § 2 of c. 93A; and (2) that ADL is jointly liable for unfair or deceptive acts committed by ADLS, because ADL had "latent power" over ADLS and "tacitly approved" the unfair and deceptive acts, see *P.F. Collier & Son Corp.* v. *Federal Trade Commn.*, 427 F.2d 261 (6th Cir.), cert. denied, 400 U.S. 926 (1970), or because ADL was "actively involved" in the relationship between ADLS and USM. See *Mongeau* v. *Boutelle*, 10 Mass. App. Ct. 246 (1980). Whether ADL's or ADLS's conduct was unfair or deceptive in violation of c. 93A is a question of fact. See *Teitelbaum* v. *Hallmark Cards Inc.*, 25 Mass. App. Ct. 555, 562 (1988). The statute "does not contemplate an overly precious standard of ethical or moral behavior. It is the standard of the commercial market place." *Wasserman* v. *Agnastopoulos*, 22 Mass. App. Ct. 672, 679 (1986). See *Levings* v. *Forbes & Wallace, Inc.*, 8 Mass. App. Ct. 498, 504 (1979). The judge found no c. 93A violation. There was no error.

The contentions based upon ADLS's conduct relate to the response time problems and, in particular, to ADLS's overly optimistic statements to USM and ADLS's failure to provide USM with a copy of Paul's report. The judge found, however, that ADLS reasonably relied on information provided by Data General and did not intend to mislead USM. He also found that USM had been made aware of the contents of the Paul report. The finding that ADLS did not act in an unfair or deceptive manner towards USM, therefore, was not clearly erroneous. Because there is no merit to any of the charges of violation of c. 93A by ADLS, we need not reach the issue of ADL's joint liability.

The contentions based on ADL's own conduct relate, first, to reports critical of the ADLS proposal to USM of which ADL was aware, knowledge of which might have influenced USM not to enter into the contract. Under G. L. c. 93A, § 2, it may be a deceptive act for a party to fail to disclose information which may have influenced a buyer not to enter into the transaction. See 940 Code Mass. Regs. § 3.16(2) (1978). See also *Purity Supreme, Inc.* v. *Attorney Gen.*, 380 Mass. 762, 776-778 (1980). The failure to disclose the Paul report requires no further comment. It is enough to say about the Allen report that the judge found that the proposed system had changed significantly between the time Allen wrote the report and when the contract was signed.

USM next contends that ADL acted deceptively when it failed to disclose to USM the insolvency of ADLS and the full extent of certain financial dealings between ADL and ADLS. The trial judge, however, found that there was no credible evidence to support the proposition that ADLS was not viable financially at the relevant times. He also found that ADL's financial reporting practices were in conformity with accepted methods within the business community and were in no way improper. Further, USM, a sophisticated business entity, he found, was not misled by any of ADL's financial reports. The judge also noted that, even if ADLS had been insolvent before the contract was signed, ADL invested substantial capital in ADLS after the contract was

signed and after the dispute arose. There was no error in the judge's conclusion that ADL's conduct did not violate c. 93A.

Accordingly, we affirm the judgment in favor of ADL. We reverse the judgment in favor of ADLS on USM's claim and on the counterclaim, vacate the award of costs, and remand the case to the trial judge in the Superior Court for a determination of the damages due USM for breach of contract.

*So ordered.*